Dear Mr. Bergeron:
Hospital Service District No. 1 of the Parish of Terrebonne questions whether or not State Bond Commission approval is required in order for the District to enter into an interest rate swap agreement. In short we believe that State Bond Commission approval is not required.
The District is a political subdivision of the State of Louisiana. Hospital Service Districts own and operate hospitals in order to care for those that require hospital care. They are also charged with other activities that are related to caring for the sick, including research and training. Generally, they may engage in any activity that promotes the general health of their respective community.[1]
The District issued various bonds in 1998 and 2003. The bonds were approved by the State Bond Commission. The first issuance was in the amount of twenty million dollars in hospital revenue bonds for the Terrebonne General Medical Center project (Series 1998). These bonds were issued at an interest rate not exceeding 6% per annum. The District issued forty million dollars in hospital revenue refunding bonds bearing interest at not exceeding 5½% per annum (Series 1998). The District subsequently issued thirty million dollars in hospital revenue bonds bearing interest at variable or fixed rates not exceeding 12% per annum (Series 2003). Both of these series remain outstanding. The District is considering entering into an interest rate swap agreement on one or both of these series to alter the debt service payment stream by converting the fixed interest rate to a variable interest rate.
The Louisiana Constitution mandates that the state or one of its political subdivisions obtain State Bond Commission approval prior to the issuance or sale of bonds or other obligations.[2] The Louisiana State Bond Commission was created in 1968 by the Louisiana Legislature. State agencies and political subdivisions may not incur debt or levee taxes or hold elections therefore without approval of the Bond Commission *Page 2 
pursuant to the Commission's constitutional and statutory authority.[3] More specifically, a public entity cannot incur debt or issue evidences of indebtedness for the purpose of financing any project in the state of Louisiana without the consent and approval of the state bond commission.[4]
The Commission receives applications from parishes, municipalities, special taxing districts and other political subdivisions of the state requesting authority to incur debt or levee taxes. These applications are reviewed by the Commission for compliance with constitutional and statutory requirements and feasibility; that is, the applicant's ability to repay the proposed indebtedness. If an application is in order, it is placed on the agenda for consideration by the Commission at its regular or special meeting.
The first consideration in our analysis is whether or not an interest rate swap agreement is debt. Debt is more than an obligation to pay a sum of money. As defined in the statutes, debt is incurred when there is a financing.[5] An interest rate swap is a type of derivative. A derivative is a financial product in the form of a contract that derives its economic characteristics from something else. In the case of an interest rate swap, it is the level of an interest rate index (i.e. London Interbank Offering Rate or LIBOR). An interest rate swap is, therefore, a contract. There are typically two contracting parties known as swap counterparties. The parties agree to pay to the other an amount equal to the interest on a specified notional principle. It is very simply an interest rate hedge. The swap allows a party to reduce its interest risk and increase its net investment return without changing its investment portfolio or refinancing the debt. There is no borrowing. The debt, the actual borrowing, is the bond.
As an example, parties A and B agree to an exchange of cash flows through a swap agreement. The agreement includes a notional principle amount of $100 million dollars. Party A issued variable rate bonds and agrees to pay Party B a fixed interest rate (5% on the notional amount). Party B agrees to pay Party A a variable rate based on LIBOR. Party A, the issuer, pays its bond holders the variable rate established in the bond but has eliminated or at a minimum managed its potential exposure to the risk that interest rates will rise to a level that would create cash flow problems.
There is no borrowing in the example. Thus, there is no new debt. There is no new financing.[6] There is, rather, an exchange of cash flows arising out of already existing debt pursuant to a contractual obligation to pay a certain sum of money.
An interest rate swap agreement is, in Louisiana law, a type of credit enhancement device. A credit enhancement device is defined as municipal bond insurance, bank *Page 3 
guarantees, surety bonds, letters of credit, contracts commonly known as interest rate swap agreements, forward payment conversion agreements, etc.[7] The law recognizes that in some instances the marketability of securities may be enhanced and interest costs reduced by the use of these devices.[8]
Our law favors the use of credit enhancement devices only in those instances where it is financially advantageous to the public entity. These contracts are entered into in connection with the sale of securities. As such, a public entity may enter into contracts with providers of credit enhancement devices if the entity determines that it will benefit from such an agreement.[9] The law does not require that such devices be approved by the Bond Commission.
The District's debt consists of the previously issued and approved bonds. The interest rate swap agreement is a credit enhancement device that takes the form of a derivative. There is no borrowing or financing. There is no new debt. There is, however, a contract by which the District will obligate itself to pay a certain sum of money to another party. This obligation to pay does not constitute debt. Certainly, the District must seriously consider all benefits and risks of entering into such a contract. Most swap agreements include a penalty provision if a party chooses to terminate the agreement. Keep in mind that the law encourages this device only if it is financially advantageous to the public entity. As such, we strongly recommend and encourage the District to seek guidance from bond counsel and financial analysts in determining whether or not there is a benefit and if that benefit outweighs any risks associated with the contract.
We trust this responds to your request. If you have additional questions, please contact our office.
With kindest regards,
Yours very truly,
 CHARLES C. FOTI, JR. Attorney General
 BY: ___________________________ TINA VICARI GRANT Assistant Attorney General
CCF, jr./TVG/dam
[1] La. R.S. 46:1051, et seq.
[2] Article 7, Section 8 of the Louisiana Constitution.
[3] Rules and Regulation of the Louisiana State Bond Commission.
[4] La. R.S. 39:1405B.
[5] Id.
[6] Atty. Gen. Op. No. 05-0213A
[7] La. R.S. 39:1421.
[8] La. R.S. 39:1429.
[9] Id.